No. 24-1355

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

BROC T. WALTERMEYER,

Plaintiff-Appellant,

v.

ROBERT HAZLEWOOD, Warden, FCI Berlin; DIANE L. KISLER, Physician, FCI Berlin,

Defendants-Appellees.

On Appeal from the U.S. District Court
for the District of New Hampshire
No. 1:19-CV-233, Hon. Landya McCafferty

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SARAH CARROLL
JAYNIE LILLEY
*Attorneys, Appellate Staff*
*Civil Division, Room 7321*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3542*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUE ....................................................................1

STATEMENT OF THE CASE .....................................................................2

      A.    Legal Background ............................................................2

      B.    Factual Background ..........................................................6

      C.    Prior Proceedings ............................................................8

SUMMARY OF ARGUMENT .................................................................. 13

STANDARD OF REVIEW ....................................................................... 14

ARGUMENT ........................................................................................... 14

THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S
*BIVENS* CLAIMS. ................................................................................ 14

      A.    Courts must exercise extreme caution before extending *Bivens* to
           new contexts. ..............................................................14

      B.    Plaintiff's claims arise in a new context. ...................................16

      C.    Special factors counsel against expanding *Bivens* to plaintiff's
           claims. ......................................................................21

      D.    Plaintiff offers no reason to disturb the district court's judgment..........24

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ...................................................................................22

*Arias v. Herzon,*
   680 F. Supp. 3d 61 (D.N.H. 2023) ..............................................................12

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................. 2, 14

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ........................................................................ 1, 2, 8

*Bulger v. Hurwitz,*
   62 F.4th 127 (4th 2023) ............................................................... 11, 19, 26

*Bush v. Lucas,*
   462 U.S. 367 (1983) ......................................................................... 23

*Carlson v. Green,*
   446 U.S. 14 (1980) .................................................................... 2, 16, 18

*Chappell v. Wallace,*
   462 U.S. 296 (1983) ......................................................................... 21

*Correctional Servs. Corp. v. Malesko,*
   534 U.S. 61 (2001) ................................................... 2, 14, 15-16, 20

*Davis v. Passman,*
   442 U.S. 228 (1979) ........................................................................... 2

*Egbert v. Boule,*
   596 U.S. 482 (2022) ........................................... 3, 12, 14, 15, 21, 22, 24, 27

*González v. Vélez,*
   864 F.3d 45 (1st Cir. 2017) ....................................................... 14-15, 24

*Hernandez v. Mesa,*
   589 U.S. 93 (2020) ..................................................................... 3, 16

*Johnson v. Terry,*
   No. 23-11394, 2024 WL 4379803 (11th Cir. Oct. 3, 2024) ........................ 26

*Kalu v. Spaulding*,
   113 F.4th 311 (3d Cir. 2024) ....................................................... 19

*Martinez v. Colon*,
   54 F.3d 980 (1st Cir. 1995) .......................................................... 25

*Meija v. Miller*,
   61 F.4th 663 (9th Cir. 2023) ........................................................ 26

*Noe v. U.S. Gov't*,
   No. 23-1025, 2023 WL 8868491 (10th Cir. Dec. 22, 2023) ............... 12, 26

*Ocasio-Hernandez v. Fortuno-Burset*,
   640 F.3d 1 (1st Cir. 2011) ........................................................... 14

*Pettibone v. Russell*,
   59 F.4th 449 (9th Cir. 2023) ...................................................... 19, 26

*Quinones-Pimentel v. Cannon*,
   85 F.4th 63 (1st Cir. 2023) .................................................. 11, 17, 24

*Sargeant v. Barfield*,
   87 F.4th 358 (7th Cir. 2023) ......................................................... 19

*Tate v. Harmon*,
   54 F.4th 839 (4th Cir. 2022) ......................................................... 16

*Turner v. Safley*,
   482 U.S. 78 (1987) ............................................................. 18, 19, 27

*United States v. Fernandez*,
   145 F.3d 59 (1st Cir. 1998) .......................................................... 25

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ....................................................................23

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ............................. 2, 3, 14, 15, 16, 17, 18, 20, 21, 23, 26

**Statutes:**

Civil Rights of Institutionalized Persons Act,
   Pub. L. No. 96-247, 94 Stat. 349 (1980) .........................................27

Prison Litigation Reform Act of 1995,
    Pub. L. No. 104-134, tit. VIII, §§ 801-810,
    110 Stat. 1321, 1321-66 to 1321-77 (1996) ....................................................27

Prison Rape Elimination Act of 2003,
    34 U.S.C. §§ 30301-30309 ..............................................................................27

18 U.S.C. § 3621(i)(1) ...............................................................................................22

18 U.S.C. § 3622(a)(3) ..............................................................................................22

18 U.S.C. § 3626 .......................................................................................................23

28 U.S.C. § 1331 .........................................................................................................1

**Rule:**

Fed. R. App. P. 4(a)(1)(B)(iv) .....................................................................................1

**Legislative Material:**

Federal Prison Oversight Act,
    H.R. 3019, 118th Cong. (2024) ......................................................................27

**Other Authorities:**

BOP, *About Our Agency*, https://perma.cc/LF37-DXWE ........................................ 3, 22

BOP, No. 6031.04, *Program Statement: Patient Care* (June 3, 2014):
    § 7 .................................................................................................. 4, 5, 18
    § 8 ............................................................................................. 3, 4, 4-5, 5, 6
    § 9 .......................................................................................................... 4
    §§ 17-19...................................................................................................... 6
    §§ 21-22...................................................................................................... 6

## REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD

We do not believe that the issues on appeal are sufficiently complex as to warrant argument, but the government of course stands ready to present oral argument if the Court believes argument is appropriate.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court granted defendants' motion to dismiss on March 14, 2024, and entered final judgment on March 15, 2024. Appellant Add. 1-9.[1] Plaintiff filed a timely notice of appeal on April 8, 2024, within the 60 days allowed under Federal Rule of Appellate Procedure 4(a)(1)(B)(iv). Appellant App. 26.

## STATEMENT OF THE ISSUE

Plaintiff, a former inmate at the Federal Correctional Institution in Berlin, New Hampshire (FCI Berlin), brought claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against the Warden of the facility and a prison doctor, alleging violations of the Eighth Amendment by not providing him with knee surgery and instead pursuing a more conservative course of medical treatment prior to his ultimately receiving surgery once he was deemed eligible. The question presented is:

> Whether the district court correctly dismissed plaintiff's *Bivens* claims for inadequate medical treatment of his knee condition.

---

[1] Citations to "Appellant Add. __" refer to the addendum to appellant's opening brief. Citations to "Appellant App. __" refer to appellant's appendix. Citations to "Supp. App. __" refer to the Supplemental Appendix filed with appellee's response brief.

**STATEMENT OF THE CASE**

**A.     Legal Background**

**1.**  In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)).  *Bivens* held that, despite the absence of a statutory cause of action, federal law-enforcement officials could be sued for money damages for conducting a warrantless search and arrest in a person's home, accompanied by the excessive use of force, in violation of the Fourth Amendment. *Bivens*, 403 U.S. at 389.  The Court has approved an implied damages remedy under the Constitution only two other times, in *Davis v. Passman*, 442 U.S. 228 (1979), for an equal-protection violation involving sex discrimination in congressional-staff employment, and in *Carlson v. Green*, 446 U.S. 14 (1980), for an Eighth Amendment violation involving the failure to provide competent treatment during an inmate's severe asthma attack.

The Supreme Court's decision in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), makes clear that the continued expansion of *Bivens* to "any new context or new category of defendants" is a "disfavored judicial activity." *Id.* at 135 (quotation marks omitted). *Abbasi* held that a court must apply a two-part test to determine whether it can recognize a cause of action against federal officials in their personal capacities.  First, a

court determines whether the claim arises in a "new *Bivens* context" by determining whether the case differs "in a meaningful way from previous *Bivens* cases decided by th[e Supreme] Court." *Id.* at 139. Second, the court must consider whether any special factors counsel hesitation before creating the new damages remedy in that context. *Id.* at 140. "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quotation marks omitted). In asking whether special factors counsel hesitation, the court gives important weight to "'separation-of-powers principles'" and "consider[s] the risk of interfering with the authority of the other branches." *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020) (quoting *Abbasi*, 582 U.S. at 135).

**2.** The provision of medical care to the approximately 150,000 inmates in Bureau of Prisons' (BOP) care involves a complex system that balances medical judgments, resource-allocation, security, and timing decisions for treatment in BOP facilities by BOP medical providers as well as referrals for treatment by medical providers outside BOP facilities. That system is governed in part by BOP Program Statements that set forth different processes for review and approval of treatments for different conditions. *See* BOP, *About Our Agency*, https://perma.cc/LF37-DXWE; BOP, No. 6031.04, *Program Statement: Patient Care* § 8, at 7-8 (June 3, 2014) (BOP Program Statement 6031.04).

BOP provides five major levels of care to inmates, with specific processes for the provision and approval of care in each category: (1) Medically Necessary – Acute

or Emergent; (2) Medically Necessary – Non-Emergent; (3) Medically Acceptable – Not Always Necessary; (4) Limited Medical Value; and (5) Extraordinary. BOP Program Statement 6031.04, § 7, at 5-7. For instance, the "Medically Acceptable – Not Always Necessary" level of care includes "[m]edical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life," including "[j]oint replacement"; "[r]econstruction of the anterior cruciate ligament of the knee"; and "[t]reatment of non-cancerous skin conditions (e.g. skin tags, lipomas)." *Id.* § 7, at 6. For treatment of conditions in this category, BOP requires the relevant institution's Utilization Review Committee to review recommendations for therapeutic interventions. By contrast, if a certain type of acute or emergency care is considered "[m]edically [n]ecessary," Utilization Review Committee review is not required before treatment is provided. *Id.* § 8, at 8 (quotation marks omitted). In addition, each institution has separate procedures for emergency/urgent care, including "[e]mergency on-call procedures for hours that health care providers are not on-site." *Id.* § 9, at 9 (noting "[American Correctional Association] standards require a four-minute response to life- or limb-threatening medical emergencies").

Each federal prison has a Utilization Review Committee, which is chaired by the Clinical Director at that facility and includes: the Health Services Administrator, Medical Trip Coordinator, Health care provider(s) directly involved in the reviewed cases, Director of Nursing, and a chaplain or social worker. *See* BOP Program

Statement 6031.04, § 8, at 7. The Utilization Review Committee reviews, among other things, referrals for outside medical and surgical procedures and evaluations by medical specialists. When deciding whether to approve treatment for conditions considered "Medically Acceptable – Not Always Necessary", a Committee considers factors including: "[t]he risks and benefits of the treatment"; "[a]vailable resources"; "[n]atural history of the condition"; and "[t]he effect of the intervention on inmate functioning in his/her activities of daily living." *Id.* § 7, at 6. Following the Committee's review, it must make one or more of the following recommendations to the prison's Clinical Director: "[a]pprove the request without modification"; "[r]efer the inmate for further evaluation to a staff physician"; "[r]efer the inmate for further evaluation to a specialty consultant"; "[p]ut the inmate on a waiting list, with recommended parameters as to the length of time the procedure may be delayed without increasing the risk of additional morbidity"; "[d]etermine that the procedure is contraindicated, due to unacceptable risk to the inmate if it is performed"; or "[d]eny the request for the procedure." *Id.* § 8, at 8. The Clinical Director makes the final decision for the Committee but is not bound by the recommendations of consulting providers. *Id.* Where the Clinical Director departs from the clinical recommendations, the Director provides a justification for that departure in the inmate's health records. *Id.* The Clinical Director may also request a secondary review for treatments or procedures in this category on a case-by-case basis through

the regional Clinical Specialty Consultants or a Central Office physician. In addition, certain conditions may require pre-certification, or prior approval. *Id.*

In addition, BOP requires each institution to have written surgical policies and procedures; sets requirements for triage of services within an institution; and imposes requirements for intake screening, physical and mental health examinations, and ordering appropriate laboratory and diagnostic testing. BOP Program Statement 6031.04, §§ 17-19, 21-22, at 21-24, 30.

## B. Factual Background

Plaintiff Broc T. Waltermeyer, a federal inmate, has been in BOP custody from 2017 to present. During his time of incarceration, he has been diagnosed with a degenerative knee condition, Hepatitis C, and a lipoma on his shoulder.[2] Supp. App. 2-6. Plaintiff was incarcerated at the Federal Correctional Institute in Berlin, New Hampshire, from May 2018 until July 2019. He was then transferred to a different BOP facility that was equipped to treat his Hepatitis C, a condition that creates specialized risks. Supp. App. 4, 6 n.2. Plaintiff alleges that he experienced chronic and severe knee pain beginning in 2011, prior to his time at FCI Berlin. Supp. App 3. Once he arrived at FCI Berlin in 2018, defendant Dr. Diane L. Kistler, a BOP

---

[2] Plaintiff's claims in district court included *Bivens* claims relating to allegedly inadequate treatment for Hepatitis C and lipoma. *See* Supp. App. 12, 19. The district court granted plaintiff's request to drop those claims because he had received treatment for Hepatitis C and lipoma, *see* Supp. App. 20; Supp. App. 12, 19.

physician at the facility, diagnosed him with degenerative bone disease in both knees. Supp. App. 7.

Plaintiff received care and treatment for his knee condition during his time at FCI Berlin. He was referred to and received a consultation with an outside orthopedic specialist. That specialist stated that plaintiff would eventually need to have both of his knees replaced, but the specialist advised that plaintiff was too young to have that surgery, which is "generally not recommended for people under fifty." Supp. App. 7. While at FCI Berlin, plaintiff requested diagnostic imaging for his knees. Dr. Kistler examined plaintiff in September 2018 and then requested and obtained approval for an MRI. Supp. App. 8. The MRI was conducted in December 2018. Supp. App. 8. Plaintiff also requested cortisone injections for his knee pain, and Dr. Kistler approved plaintiff to receive the injections. Supp. App. 8. Plaintiff alleges that he received them every six months, not every month as he requested. Supp. App. 8. Plaintiff's knee condition was also treated with "pain medication, special shoes, knee braces, cortisone shots, access to a low bunk, and a cane." Supp. App. 8. Plaintiff sought approval from Dr. Kistler for knee replacement surgery, but Dr. Kistler did not approve surgery, relying on the outside orthopedic specialist's recommendation against plaintiff having surgery due to his age and other health conditions. Supp. App. 8.

## C.    Prior Proceedings

In March 2019, plaintiff filed suit against Warden Hazlewood and Dr. Kistler as well as unidentified members of the FCI Berlin Utilization Review Committee for damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), for violations of the Eighth Amendment.  Supp. App. 2. Plaintiff alleged that both Warden Hazlewood and Dr. Kistler were aware of his serious need for treatment for his knee condition since September 2018, but that they, along with the Utilization Review Committee, denied him treatment for that condition.  Supp. App. 2.  More specifically, he claims that the defendants unconstitutionally denied him knee replacement surgery and his preferred pain management regime, while providing him with other treatment.  Plaintiff also sought injunctive relief, requesting certain medical care for his knee condition as well as Hepatitis C and lipoma.

**1.**  The district court denied plaintiff's motion for a preliminary injunction seeking medical care as moot following plaintiff's transfer to a new facility, where he could be treated for Hepatitis C.  *See* Supp. App. 1; Appellant App. 32-33 (text entry of Report and Recommendation).  Following screening by a magistrate judge, the district court granted plaintiff's request to dismiss his claims relating to allegedly inadequate treatment for Hepatitis C and lipoma because he had received treatment for Hepatitis C and lipoma at the new facility, *see* Supp. App. 20; Supp. App. 12, 19. The district court also dismissed the unnamed defendants who were members of the

Utilization Review Committee, because plaintiff had not alleged facts "showing that any particular request was presented to the URC and denied, or that any URC member who may have denied a request was acting with deliberate indifference to Mr. Waltermeyer's serious medical needs." *See* Supp. App. 17; Supp. App. 20.

**2.** Defendants moved to dismiss the complaint on the grounds that no *Bivens* remedy was available for plaintiff's claims. A magistrate judge issued a Report and Recommendation recommending denying the motion, noting that "[w]hile the question is a close one, this court finds that in light of the unsettled nature of the relevant case law that has been decided since *Egbert*, as well as the early stage of the proceedings in this case, the issues raised by the defendants' motion would be better resolved after development of the factual record." Appellant App. 8. The magistrate concluded that more factual development was necessary to determine whether the differences between plaintiff's condition and treatment and the claim at issue in *Carlson* were sufficiently "meaningful" to render his claims a new context. Appellant App. 13-14. In addition, the magistrate deferred ruling on whether other distinctions with *Carlson* were meaningful, including whether plaintiff's claim challenged BOP's "treatment of chronic conditions" instead of its response to "a life-threatening emergency." Appellant App. 17-20 (quotation marks omitted). The magistrate also noted confusion over whether the administrative remedy scheme was a new context distinction at step one of the *Abbasi* framework or a special factor at step two. Appellant App. 17-20.

The magistrate likewise concluded that "the asserted presence of 'special factors' should await further development of the facts." Appellant Appx. 18. While acknowledging that alternative remedies can preclude recognition of a new *Bivens* remedy, the magistrate saw "no indication that Congress or the Executive, as opposed to the courts, has created an injunctive remedy for claims of inadequate medical care in prison" and reasoned that the fact plaintiff's claim for injunctive relief against the individual defendants became moot when he was transferred to a facility outside their jurisdiction meant that "no such remedy was available." Appellant App. 21 & n.5. The magistrate also rejected as a special factor defendants' contention that "medical care for chronic conditions is a specialized activity requiring a high degree of training and qualification, and the provision of such care is made all the more multifaceted because it must coincide with the security demands and inherent limitations of the custody setting." *Id.* at 16 (alteration and quotation marks omitted). The magistrate further rejected the availability of alternative remedies including internal processes for reporting misconduct by BOP employees and the Federal Tort Claims Act. Appellant App. 22-23. Finally, the magistrate considered and rejected as a special factor "Congress' frequent and intensive legislation regarding the rights and protections of incarcerated people, including its passage of the [Prison Litigation Reform Act] and legislation aimed at providing adequate medical care to inmates." Appellant App. 23-24

The district court rejected the Report and Recommendation and dismissed plaintiff's *Bivens* claim, holding that a *Bivens* remedy is not available for his Eighth Amendment claim for inadequate treatment of his knee condition. Appellant Add. 1-8.

Relying on this Court's decision in *Quinones-Pimentel v. Cannon*, 85 F.4th 63, 69 (1st Cir. 2023), the district court explained that "[s]ince *Carlson*, the Supreme Court has 'consistently' refused to extend *Bivens* despite numerous opportunities to do so." Appellant Add. 2. The court further explained that "[i]nstead, the Court has imposed 'a highly restrictive two-step analysis,' which limits when claims for damages against federal officers may proceed." Appellant Add. 2 (citing *Bulger v. Hurwitz*, 62 F.4th 127, 136-37 (4th Cir. 2023)). The district court reasoned that, under the first step, "[a] claim arises in a new context if it is 'meaningfully different'" from *Carlson*. Appellant Add. 2. And, if the case arises in a new context, then the court proceeds to consider whether there are special factors that counsel hesitation before extending *Bivens* to the new context. Appellant Add. 3. Citing *Egbert*, the court emphasized that the availability of alternative remedies is one such special factor that would preclude recognition of a new *Bivens* remedy, and the court further noted *Egbert*'s suggestion that the presence of special factors that previous cases did not consider can itself render a context new. Appellant Add. 3.

The district court held that "[r]egardless of the similarity between Waltermeyer's alleged circumstances and the facts in *Carlson*," plaintiff's claim

presents a new context from *Carlson*. Appellant Add. 5, 7. Relying on *Noe v. United States Government*, No. 23-1025, 2023 WL 8868491, at *3 (10th Cir. Dec. 22, 2023), the court held that the existence of the Bureau of Prisons Administrative Remedy Program "eliminates any possibility that his claim survives." Appellant Add. 5; Appellant Add. at 4 ("The bottom line is that *Egbert* precludes a *Bivens* claim where there is a new alternative remedial structure available to the plaintiff."). "In cases where an alternative remedial scheme (that was not considered by the Court in *Carlson*) exists, *Egbert* and *Abbasi* command the lower courts to exercise judicial restraint and defer to the authority of the executive (or legislative) branch that provided the alternative remedy." Appellant Add. 5; Appellant Add. 5-6 (citing *Arias v. Herzon*, 680 F. Supp. 3d 61, 64 (D.N.H. 2023)).

The district court rejected the contention that "more factual development is necessary to determine whether alternative remedies were available to Waltermeyer," noting that plaintiff did not dispute that the Administrative Remedy Program was available to him. Appellant Add. 7 & n.1 (noting that plaintiff's complaint alleged that he had exhausted the administrative remedy process). The district court further rejected the contention that other remedies, beyond the Administrative Remedy Program, were insufficient to resolve plaintiff's claim. Appellant Add. 7. Instead, "the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." Appellant Add. 7 (quoting *Egbert*, 596 U.S. at 498).

## SUMMARY OF ARGUMENT

The district court correctly rejected plaintiff's *Bivens* claims against a BOP Warden and doctor. The court properly declined to extend *Bivens* to allow plaintiff to seek monetary damages from individual BOP employees based on his dissatisfaction with the medical care BOP provided him.

Plaintiff's claims—which challenge the timing of, and course of treatment preceding, the knee replacement surgery BOP arranged for plaintiff—arise in a new context, implicating and challenging systemic conditions in BOP's management of medical conditions within the inmate population. While *Carlson* involved acts of malfeasance by individuals, the claims in this case are set within the context of BOP's systemic management of medical conditions and pursuant to protocols that govern treatment decisions. Although this case seeks to hold a BOP doctor and Warden personally liable for the care plaintiff received at FCI Berlin, at its essence it is a challenge to systemic decisions made by BOP pursuant to BOP policies. BOP resource-allocation, security, and timing decisions that underlie consultations and elective procedures performed outside of BOP's facilities and the scheduling of surgeries like plaintiff's are starkly different from the matters at issue in any of the three previously recognized *Bivens* contexts. Plaintiff does not even attempt to refute that, if his claim arises in a new context, special factors—such as judicial intrusion into BOP's management of medical treatments and security resources and the availability of alternative remedial schemes—preclude recognition of a *Bivens* remedy.

Because plaintiff's claim could not survive under the familiar two-step inquiry set out in *Abbasi*, *Egbert*, and this Court's cases, the Court need not decide whether the availability of alternative remedies collapses the two steps into one.

## STANDARD OF REVIEW

This Court reviews the dismissal of a complaint for failure to state a claim de novo, accepting all well-pleaded factual allegations—but not conclusory statements or legal conclusions—as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

## ARGUMENT

## THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S *BIVENS* CLAIMS.

### A. Courts must exercise extreme caution before extending *Bivens* to new contexts.

Federal courts have limited authority "to imply a new constitutional tort[] not expressly authorized by statute." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). The Supreme Court has recently emphasized that creating a *Bivens* remedy is a "'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017); *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022). This Court has explained that following *Egbert*, expanding *Bivens* beyond the three contexts the Supreme Court has recognized "is a disfavored judicial activity," and the Supreme Court has "made plain its reluctance to extend the *Bivens* doctrine to new settings." *González v. Vélez*, 864 F.3d 45, 52 (1st Cir.

2017); *Egbert*, 596 U.S. at 490-91 (quotation marks omitted) (describing the only three

contexts in which the Supreme Court has recognized a *Bivens* cause of action).

Indeed, a court cannot extend *Bivens* to a new context even based solely on

"parallel circumstances" with the facts in the three recognized *Bivens* contexts; the

claims must also "satisf[y] the 'analytic framework' prescribed by the last four decades

of intervening case law." *Egbert*, 596 U.S. at 501 (quoting *Abbasi*, 582 U.S. at 139).

*Egbert*, for example, held that while that case and *Bivens* itself involved similar

allegations of excessive force, those "superficial similarities are not enough to support

the judicial creation of a cause of action." *Id.* at 495. The reluctance to extend *Bivens*

is rooted in constitutional concerns. "[I]t is a significant step under separation-of-

powers principles for a court to determine that it has the authority, under the judicial

power, to create and enforce a cause of action for damages against federal officials in

order to remedy a constitutional violation." *Abbasi*, 582 U.S. at 133.

Although plaintiff seeks to hold two individual BOP employees personally

liable for the care he received at FCI Berlin, his *Bivens* claim is at its essence a

challenge to systemic decisions made by BOP. Separation-of-powers concerns are

heightened when the asserted "claims would call into question the formulation and

implementation of a general policy," even if the claims are "confined to the conduct

of a particular Executive Official in a discrete instance." *Abbasi*, 582 U.S. at 141. The

purpose of a *Bivens* damages remedy is to "deter[] the unconstitutional acts of

individual officers," not the "conduct of a policymaking entity." *Malesko*, 534 U.S. at

15

71; *see Abbasi*, 582 U.S. at 140-41. Accordingly, a case may present a new context from the three the Supreme Court has recognized, despite factual similarities, where that new claim presents a novel "risk of disruptive intrusion by the Judiciary into the functioning of other branches" or requires the examination of different "judicial guidance as to how an officer should respond to the problem or emergency to be confronted." *Abbasi*, 582 U.S. at 139-40 (explaining that such "differences . . . are meaningful enough to make a given context a new one"); *see Tate v. Harmon*, 54 F.4th 839, 846 (4th Cir. 2022) (declining to expand *Bivens* to what would amount to a "broad-based, systemic claim" even if the plaintiff's challenges involved discrete acts or decisions).

B. **Plaintiff's claims arise in a new context.**

The district court correctly held that this case presents a new context from *Carlson v. Green*, 446 U.S. 14 (1980). Appellant Add. 7. The Supreme Court has explained that the new context inquiry is "broad." *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). Thus, even if differences between plaintiff's case and *Carlson* are "perhaps small, at least in practical terms," the inquiry is "easily satisfied." *Abbasi*, 582 U.S. at 147-49 ("Yet even a modest extension is still an extension."). And courts look to a number of factors to determine whether a context is novel, including the generality or specificity of the official action, the extent of judicial guidance as to how an officer should respond to a problem or emergency, the statutory or other legal mandate under which the officer was operating, and the risk of disruptive intrusion by the

judiciary into the functioning of other branches of government. *Id.* at 139-40; *see also Quinones-Pimentel v. Cannon*, 85 F.4th 63, 70 (1st Cir. 2023) (explaining "meaningful" but not "trivial" differences create a new context).

Plaintiff's claims present a novel context. He alleges that the treatment he received for his knee condition, which included conservative treatment measures and ultimately surgery, was constitutionally inadequate. Although he seeks in this suit to hold two BOP employees individually liable, his claims actually rest on his dissatisfaction with the BOP's institutional decisions regarding the proper treatment of particular medical conditions and the circumstances in which individuals may be authorized to undergo elective surgery. *Carlson*, by contrast, involved individual BOP employees' discrete acts of malfeasance by providing contra-indicated treatment and failing to provide emergency care—allegations that were significantly different from plaintiff's claims regarding his dissatisfaction with BOP's course of treatment for his knee condition. Because plaintiff's claims implicate and challenge BOP policy, they are meaningfully different along numerous dimensions the Supreme Court has identified: they necessarily implicate the "risk of disruptive intrusion by the Judiciary" into prison functions, they bear on "the generality or specificity of the official action" and the "extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted," and they implicate "special factors that previous *Bivens* cases did not consider." *Abbasi*, 582 U.S. at 140.

Although framed as a claim for individual damages against the Warden of the facility and the doctor who treated him, plaintiff's claims implicate and challenge broader and more systemic issues within BOP, like administrative decisions concerning the management of certain medical conditions and resource allocation, security and timing decisions relating to outside consultation, and the scheduling of surgeries. *See* BOP Program Statement 6031.04, § 7, at 6 (explaining that approval of treatments classified as "Medically Acceptable – Not Always Necessary" turns on Utilization Review Committee consideration of "[a]vailable resources," as well as the treatment's "risks and benefits" and effect on an inmate's "activities of daily living"). Indeed, plaintiff initially sued members of his facility's Utilization Review Committee, underscoring that his grievance is with BOP policy, not with individual acts of malfeasance by the defendant employees. *See infra* p. 25. Courts have not provided— and are ill-suited to provide—the same degree of guidance for how BOP must balance and manage such decisions, *Turner v. Safley*, 482 U.S. 78, 84-86 (1987), compared with the straightforward application of existing judicial guidance at issue in *Carlson*, 446 U.S. at 17 & n.3.

Even if courts could manage such decisions, doing so would involve a significantly greater "risk of disruptive intrusion by the Judiciary" into prison functions than *Carlson*. *Abbasi*, 582 U.S. at 140. Claims like plaintiff's would require prison employees who are implementing BOP medical policies to weigh the risk of individual-capacity damages suits brought by inmates who disagree with the agency's

systemic decisions about how to manage care and balance resource constraints, security considerations, and other matters. Plaintiff's claim, unlike the allegations of straightforward individual malfeasance in *Carlson*, therefore implicates "sensitive line-drawing considerations that courts are ill-positioned to assess." *Kalu v. Spaulding*, 113 F.4th 311, 328 (3d Cir. 2024); *see also Sargeant v. Barfield*, 87 F.4th 358, 367 (7th Cir. 2023) (finding a new context where the plaintiff's prison-related claim "factor[ed] in a sensitive mixture of things [courts] are ill-positioned to assess—a prison's determinations about safety, discipline, and resources"); *Bulger v. Hurwitz*, 62 F.4th 127, 138 (4th Cir. 2023) (recognizing that claims would "extend the bounds of liability the Court's previous *Bivens* actions established, implicating not only the scope of [each official's] responsibilities and duties but also the organizational policies, administrative decisions, and economic concerns inextricably tied to" the determinations at issue). "The heightened risk of intrusive judicial inquiry into an area that has been committed to the responsibility of the political branches distinguishes this case from *Carlson* and provides another reason to conclude that it presents a new *Bivens* context." *Kalu*, 113 F.4th at 329 (citing *Turner*, 482 U.S. at 85); *cf. Pettibone v. Russell*, 59 F.4th 449, 455 (9th Cir. 2023) (finding a greater risk of disruptive intrusion where the defendant "was carrying out an executive order").

Relatedly, plaintiff's claims implicate the complex system of prison healthcare and many other actors, such as the prison staff who contact and schedule surgeries with an outside provider, as well as that outside provider's availability and the staff

and resources it takes to transport and accompany inmates to an appointment outside the secure confines of a BOP facility. Claims levied against prison supervisory and administrative staff, such as the Warden, also present a new context because judicial guidance regarding how these administrators should respond when faced with an inmate's surgery request is far less developed than the medical scenario the Court addressed in *Carlson*. *See Abbasi*, 582 U.S. at 148 ("[T]he judicial guidance available to this warden, with respect to his supervisory duties, was less developed.").

Plaintiff's *Bivens* claims would seek to hold individual BOP employees responsible for the alleged delay and associated pain he allegedly suffered as numerous actors operating under BOP policies came together to arrange treatment for him. As the Supreme Court has made clear, such attempts to use individual *Bivens* actions to permit general judicial supervision of BOP's decisions about how to administer medical care to inmates are impermissible; courts are not suited to evaluating individual treatment decisions made in the context of BOP's other resource, medical, and security constraints. *See Abbasi*, 582 U.S. at 140-41. Given that plaintiff's claims would require the very type of judicial second-guessing of prison administration and medical decision-making that the Supreme Court has cautioned against, his claims present a new context from *Carlson*. Holding individual BOP employees liable for damages for implementing BOP policies and protocol risks significant intrusion into BOP's ability to manage the provision of inmate healthcare. *See Malesko*, 534 U.S at 71; *see also Abbasi*, 582 U.S. at 140-41.

### C. Special factors counsel against expanding *Bivens* to plaintiff's claims.

If a claim arises in a new context, a *Bivens* remedy is unavailable "if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Abbasi*, 582 U.S. at 136). The focus of the special-factors inquiry is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 582 U.S. at 136.

As an initial matter, plaintiff raises no argument in his opening brief on the special-factors inquiry and thus effectively concedes that, if his claims present a new context from *Carlson*, the Court should decline to extend *Bivens* further. In any event, while it is clear that the presence of just one special factor alone would be a sufficient reason not to extend *Bivens*, here there are multiple special factors that—"[t]aken together" and considered in the aggregate—strongly counsel against expanding *Bivens* to include plaintiff's claim. *Chappell v. Wallace*, 462 U.S. 296, 304 (1983).

First, before a court takes the disfavored and most unusual step of extending *Bivens*, it must evaluate "policy considerations . . . at least as broad as the range . . . a legislature would consider." *Egbert*, 596 U.S. at 491 (alterations in original) (noting such considerations "include 'economic and governmental concerns,' 'administrative costs,' and the 'impact on governmental operations systemwide'"). Here, before

authorizing a *Bivens* remedy for plaintiff's claims regarding BOP's course of treatment for his knee condition (or claims like it), the court must consider the "'systemwide' consequences" of doing so. *Id.* at 493 ("Even in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. That uncertainty alone is a special factor that forecloses relief." (citation omitted)). And this Court must also consider "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.* at 499 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

To insert courts into disagreements about the proper management of medical treatment and security resources in the course of treating conditions like plaintiff's would create a serious risk of disruptive intrusion into the complexities of providing medical care in the prison setting, a responsibility Congress has delegated to the Executive Branch. 18 U.S.C. § 3621(i)(1) (charging BOP with ensuring "each prisoner . . . has access to necessary medical care, mental health care, and medicine"); *id.* § 3622(a)(3) (authorizing BOP to temporarily release a prisoner to obtain "medical treatment not otherwise available"). Undoubtedly, Congress is far better positioned to consider the consequences and costs of remedies that permit judicial second-guessing of the ways in which BOP schedules and provides medical care—both within and outside of its facilities—to the approximately 150,000 inmates in its care. *See* BOP, *About Our Agency*, *supra*.

The district court also correctly recognized that "alternative remedial structure[s]" exist that can deter and address the kinds of misconduct that plaintiff alleges. *Abbasi*, 582 U.S. at 137. The Supreme Court has held that the existence of "any alternative, existing process for protecting the injured party's interest" can counsel hesitation, *id.* (alteration omitted) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)), even when the alternatives may not enable the particular plaintiff to obtain money damages or similarly effective relief. *See, e.g.*, *Bush v. Lucas*, 462 U.S. 367, 372 (1983) (declining to create a *Bivens* remedy even though alternative processes "were not as effective as an individual damages remedy and did not fully compensate [the plaintiff] for the harm he suffered" (footnote omitted)).

Congress has provided alternative methods for relief that foreclose a *Bivens* remedy here. *See Abbasi*, 582 U.S. at 140. Plaintiff had available alternative remedies to obtain the real relief he sought in challenging systemic issues that caused an alleged delay in the provision of medical care: a claim for injunctive relief. In contrast to a *Bivens* damages claim, Congress expressly approved such a claim for federal prisoners. *See* 18 U.S.C. § 3626 (providing civil action remedies with respect to prison conditions). A court order requiring individual BOP defendants in their official capacity to provide plaintiff with his preferred form of care would have resolved the disputes he alleges. *Cf. Abassi*, 582 U.S. at 145 (noting how habeas relief, "if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages"). And, aside from a court order, plaintiff could lodge

complaints of misconduct through BOP's administrative scheme, the Department of Justice's Office of Inspector General, or BOP's internal affairs component. *See Egbert*, 596 U.S. at 498 ("And, again, the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts."); *cf. González*, 864 F.3d at 55 ("The fact that other or different relief might be available to [plaintiffs] if constitutional tort suits were permitted does not alter this conclusion.").

### D. Plaintiff offers no reason to disturb the district court's judgment.

Plaintiff's principal contention is that the district court erred by considering the availability of BOP's Administrative Remedy Program as a basis for holding that plaintiff's claim presents a new context from *Carlson*. *See* Opening Br. 4-10. Plaintiff argues that adopting such an argument would mean that "*Bivens* and *Carlson* have been silently overruled in all circumstances." Opening Br. 4. In plaintiff's view, because "[t]he administrative grievance process applies to all medical deliberate indifference claims," treating it as meaningful difference from *Carlson* "would mean that *Carlson* has been overruled." Opening Br. 8.

This Court has noted that "the Supreme Court has never overruled *Bivens* and, most recently, clarified how courts should assess such claims." *Quinones-Pimentel*, 85 F.4th at 69. As explained, plaintiff's claims fail under the Court's two-step *Abbasi* framework. It is therefore unnecessary to address whether the availability of the administrative remedy scheme would render an inmate's claim a new context or

whether it should be considered only at the second step of the *Abbasi* framework,

given that plaintiff cannot prevail under either approach.

Indeed, it is plaintiff that has the *Abbasi* analysis backward. Plaintiff suggests

broadly (at 7) that "*Carlson* claims are not new contexts," but his characterization is far

too general. In an effort to characterize the actions challenged in this case and in

*Carlson* as "equally 'specific,'" plaintiff describes them in the most general terms:

"Each suit involved a claim of direct harm by a prison official to an individual in his

care rather than a challenge to a general policy that created certain conditions of

confinement." Opening Br. 8. As explained, that is a mischaracterization of

plaintiff's claim, which does challenge BOP policies about management of inmate

conditions. Indeed, plaintiff's attempts in district court to sue members of the

Utilization Review Committee and his attempt, for the first time on appeal, *see*

Opening Br. 2, to raise a claim under the Rehabilitation Act[3] based on "the prison's

[asserted] failure to accommodate his disability" demonstrate that his grievance is with

BOP's policies and procedures, not with the conduct of the individual defendants.

Moreover, characterizing the specificity of the official action challenged in *Carlson* at

the level of "direct harm by a prison official to an individual in his care," Opening Br.

---

[3] The Court should reject plaintiff's attempt to raise a Rehabilitation Act claim
for the first time on appeal. Even if it were properly raised, he has forfeited it by
failing to address the claim with the exception of a single sentence in the Summary of
Argument in his brief. *See United States v. Fernandez,* 145 F.3d 59, 63 (1st Cir. 1998)
(issues not fully addressed in appellate submissions are deemed forfeited); *Martinez v.
Colon,* 54 F.3d 980, 990 (1st Cir. 1995) (argument not addressed below is forfeited).

8, would suggest that there are virtually no claims brought by inmates that are outside of the *Carlson* context. That conclusion is not consistent with the Supreme Court's instruction that even small differences constitute a new context because "even a modest extension is still an extension." *Abbasi*, 582 U.S. at 147; *see also Bulger*, 62 F.4th at 138 (4th Cir. 2023) ("[E]ven claims challenging the adequacy of medical care may involve the same 'right and . . . mechanism of injury' as in *Carlson* but still present 'different' contexts.") (quoting *Abbasi*, 137 S. Ct. at 1859)).

After *Egbert*, courts must look carefully at whether claims arise in a new context. While some claims may arise in existing contexts, *see* Opening Br. 13-14, courts of appeals have found meaningful differences in cases raising Eighth Amendment claims for deliberate indifference to medical needs. *See, e.g.*, *Johnson v. Terry*, No. 23-11394, 2024 WL 4379803 (11th Cir. Oct. 3, 2024) (holding that inmate's claim arose in a new context from *Carlson*); *Noe v. U.S. Gov't*, No. 23-1025, 2023 WL 8868491, at *3 (10th Cir. Dec. 22, 2023) (same). And in the same vein, courts of appeals have applied *Egbert* in rejecting Fourth Amendment *Bivens* claims in a new context. *Meija v. Miller*, 61 F.4th 663, 669 (9th Cir. 2023) ("Under *Egbert*, rarely if ever is the Judiciary equally suited as Congress to extend *Bivens* even modestly."); *see also Pettibone*, 59 F.4th at 454 (while emphasizing "if 'there is any reason to think that Congress might be better equipped to create a damages remedy' for a constitutional violation, we must refrain from recognizing one" (emphasis omitted) (quoting *Egbert* 596 U.S. at 492)).

Finally, plaintiff's reliance (at 10-11) on the Prison Litigation Reform Act only underscores why *Bivens* should not be extended to this novel context. Congress's frequent legislative action in the regulation of federal prisons suggests that the judiciary should refrain from further intrusion. *See* Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, tit. VIII, §§ 801-810, 110 Stat. 1321, 1321-66 to 1321-77 (1996)); *see also* Civil Rights of Institutionalized Persons Act, Pub. L. No. 96-247, 94 Stat. 349 (1980) (authorizing the Attorney General to institute a civil action for equitable relief against state officials for constitutional violations); Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301-30309 (instructing the Attorney General to promulgate regulations for preventing, investigating, and punishing prison rape); Federal Prison Oversight Act, H.R. 3019, 118th Cong. (2024). Congress has paid extensive attention to prison administration and prison conditions, and the area is laden with policy considerations that the political branches are better suited to resolve. *See Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

SARAH CARROLL

*s/ Jaynie Lilley*

JAYNIE LILLEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7321*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3542*
  *Jaynie.lilley2@usdoj.gov*

October 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,715 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jaynie Lilley*
Jaynie Lilley

**CERTIFICATE OF SERVICE**

I certify that on October 31, 2024, I electronically transmitted the foregoing brief to the Clerk of the Court using the appellate CM/ECF System, causing it to be served on counsel of record, who are all registered CM/ECF users.


_s/ Jaynie Lilley_
Jaynie Lilley